IN THE NEBRASKA COURT OF APPEALS

MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

IN RE INTEREST OF FAHYA V.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF FAHYA V., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

KIMBERLY A., APPELLANT.

Filed July 3, 2018.   No. A-17-1130.

Appeal from the Separate Juvenile Court of Douglas County: WADIE THOMAS, Judge. Affirmed.

Brian J. Muench for appellant.

On brief, Michael Akira Greenlee, of Law Office of Michael Greenlee, for appellant.

Donald W. Kleine, Douglas County Attorney, and Sarah Schaerrer for appellee.

PIRTLE, RIEDMANN, and BISHOP, Judges.

BISHOP, Judge.

Kimberly A. appeals from the decision of the separate juvenile court of Douglas County terminating her parental rights to her daughter, Fahya V. We affirm.

BACKGROUND

*Procedural Background.*

Kimberly is the biological mother of Fahya, born in 2012 (also spelled Fayha in the record). Fahya was removed from parental care and custody in April 2014 because of Kimberly's drug use and because drugs were being sold at the home, including times when Fahya was present. Fahya's

- 1 -

hair follicle test came back positive for amphetamines, methamphetamines, cocaine, and marijuana. Fahya was placed in the custody of the Nebraska Department of Health and Human Services (DHHS) and into a foster home where she has remained, other than when she was briefly returned to the parental home from November 2015 to March 2016.

Fahya's biological father was not identified in our record. Robert A. was identified in the record as Fahya's "legal father" as he was married to Kimberly at the time of Fahya's birth. The State sought to terminate Robert's parental rights, but the outcome of those efforts does not appear in our record. Because Robert is not part of this appeal, he will not be discussed any further.

The State filed a petition on April 3, 2014, alleging that Fahya was a child as defined by Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016), because she lacked proper parental care by reason of the faults or habits of Kimberly. The State alleged that Kimberly's use of alcohol and/or controlled substances placed Fahya at risk for harm; Kimberly failed to provide Fahya with proper parental care, support and/or supervision; and therefore, Fahya was at risk of harm.

In September 2014, after a contested hearing, the juvenile court adjudicated Fahya to be within the meaning of § 43-247(3)(a). In its adjudication and disposition order, the court stated that Kimberly admitted to using marijuana and admitted that she had a methamphetamine relapse in April. The court found that Fahya tested positive through a hair follicle test for methamphetamine and cocaine shortly after removal in April. The court also found that an adult living in the home with Kimberly and Fahya was arrested for selling methamphetamine out of the home after a sting operation and controlled buys in February; Fahya was present in the home during the sting operation, and specifically during the drug buys that took place. The court ordered Kimberly to have supervised visitation, immediately enter into a residential drug and alcohol facility, follow any and all aftercare recommendations made by the provider and attend a substance abuse support group such as "AA or NA," not use drugs and alcohol, submit to random urinalysis (UA) testing, cooperate with family support services, and obtain and maintain safe and adequate housing and a legal source of income immediately upon leaving residential treatment.

A review and permanency planning hearing was held in March 2015. The March order stated that Kimberly was to have semisupervised visitation, but that if she has a positive drug screen the visits would immediately return to supervised until further order of the court. In a May "Check Hearing Order," the district court said "Visits to remain supervised." Another review and permanency planning hearing was held in August. The August order stated: the visits between Kimberly and Fahya were to "immediately go to semi-supervised"; the visits were to be "further liberalized to unsupervised to exclude overnights no later than September 21 unless there is further order from the Court"; visits were to be "further liberalized to unsupervised to include overnights no later than October 30"; and visits were to remain as set forth so long as Kimberly does not have a positive drug screen (if she did have a positive drug screen, the visits would return to supervised). Kimberly was ordered to continue to submit to UA testing, participate in either NA or AA classes, and maintain safe and adequate housing and a legal source of income.

In November 2015, Kimberly filed a motion for change of placement, asking the court to change the placement of Fahya "to include the home" of Kimberly. Kimberly alleged all visits had gone well and Kimberly was following the court's orders. The court's order filed that same day said that "effective immediately, the placement of the minor child shall include the home of the mother Kimberly," and that all previous orders of the court would remain in full and effect.

In March 2016, upon the State's motion, the court once again ordered Fahya be removed from Kimberly's home after Kimberly had numerous presumptive positive and positive drug tests for methamphetamine and amphetamines. Kimberly was ordered to have supervised visits with Fahya.

Review and permanency planning hearings were held in June and December 2016. In June, the court ordered Kimberly to complete a scheduled substance abuse evaluation. In December, the court ordered Kimberly to immediately undergo an updated chemical dependency evaluation; immediately follow the treatment recommendations in the evaluation, to include enrolling in treatment for substance abuse and mental health at the level recommended in the evaluation; submit to hair follicle testing as requested; and participate in family support services through completion, to address issues of parenting as well as any issue as identified by the service provider. In both June and December, Kimberly was also ordered to have supervised visits with Fahya, abstain from alcohol and illegal drugs, submit to random UA testing, and maintain safe and adequate housing and a legal source of income.

On March 31, 2017, the State filed a motion for termination of Kimberly's parental rights to Fahya pursuant to Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016). The State alleged that: Kimberly substantially and continuously or repeatedly neglected and refused to give the child necessary care and protection; reasonable efforts to preserve and reunify the family had failed to correct the conditions leading to the adjudication; Fahya had been in an out-of-home placement for 15 or more of the most recent 22 months; and termination was in the child's best interest.

*Termination Hearing.*

The hearing on the motion for termination of Kimberly's parental rights to Fahya was held on October 11, 2017. A summary of the evidence adduced follows.

Brittany Pijewski, a former employee of Nebraska Families Collaborative (NFC), testified that while at NFC she was Fahya's case manager from November 2015 until January 2017. When Pijewski took over the case, she reviewed Fahya's case file. Fahya became a state ward in April 2014 because there were concerns about Kimberly's substance abuse. Kimberly completed court-ordered residential treatment and then completed outpatient treatment. Following treatment and several months of clean drug screens and liberalized visits, Fahya was returned to Kimberly's home in November 2015. At a "check hearing" in February 2016, there were concerns that Kimberly's drug tests were diluted. After Kimberly had two positive drug screens in February, Pijewski went to remove Fahya from Kimberly's home. However, when Pijewski went to Kimberly's home, Fahya was not there. Kimberly said Fahya was with her father, but the police who accompanied Pijewski that day "were certain that she was there as there was a dropped ice cream cone on the floor, the vehicle was still warm as if they had just gotten home, and nobody had informed us where [Fahya] was." Fahya was eventually turned over to Pijewski and NFC "[w]eeks later" at the beginning of March. When Pijewski spoke to Kimberly about why it took so long to turn Fahya over, Kimberly said "'she was concerned about the placement that [Fahya] was going to.'"

According to Pijewski, following Fahya's second removal, Kimberly completed court-ordered substance abuse and mental health evaluations; at the time, the substance abuse evaluation said that Kimberly did not need further treatment. Kimberly was also ordered to

participate in random UA testing, but was "[n]ot 100 percent compliant," telling Pijewski that "she was busy working, trying to maintain her job so that she was financially set, that she had missed phone calls, and then she was discharged from UAs." Pijewski was concerned about Kimberly's noncompliance "[b]ecause throughout the entire case, substance abuse has been the ongoing issue." Because Kimberly was discharged after several months of noncompliance, Pijewski had to do another referral for drug testing, after which Kimberly was "participating about 50 to 75 percent." Pijewski also worked to get outpatient treatment set up, as recommended by an updated chemical dependency evaluation, and then the case was transferred because Pijewski left NFC. Before she left NFC, Pijewski referred this case for termination "[b]ecause of the ongoing substance abuse issues." She said Fahya "needed permanency in her life, and there was no ongoing consistency that drug use was no longer an issue."

During Pijewski's time on the case, Kimberly did "[n]ot consistently" participate in the requested drug testing. The results of the tests were also concerning because "[s]everal were diluted" and "[o]thers were lab-confirmed positive for methamphetamine." When Pijewski spoke with Kimberly about concerns of tampering with the drug tests, Kimberly said that she "'was not tampering and that the results were a conspiracy, that she had not used.'" Pijewski testified "the results were positive from the lab, and those are very reliable tests that are completed."

Kimberly's interactions with Fahya on visits were "generally very smooth." The only concerns Pijewski had were the amount of family present at the visits and the different locations. "[T]here were numerous different houses that the visitations were held at," and "[i]t seemed very confusing for [Fahya], as if she wasn't sure where she was or whose home she was at." When Pijewski left NFC, Kimberly had been living in her current residence for approximately 4 to 5 months, and Pijewski had determined the residence to be safe and appropriate after a walk-through. Kimberly had also been employed throughout Pijewski's time on the case.

Kelli Garner, a family permanency specialist at NFC, had been Fahya's caseworker since February 2017. When she took over the case from Pijewski, Garner reviewed the case file and court orders. At the time, there were concerns because Kimberly was not able to consistently maintain her sobriety. She had been ordered to participate in supervised visits, engage in UAs, and abstain from using drugs or alcohol. Kimberly was also to maintain safe and stable housing. She was renting a home from a man who, at the time of the termination hearing, was incarcerated on drug charges; it was concerning to Garner that Kimberly would associate herself with people who were involved with drugs.

Garner testified there were no concerns with Kimberly's visits, other than a few locations where she chose to have the visits that were questionable. For example, Kimberly chose a bar as the location for visitation on three occasions during the December 2016 to May 2017 reporting period. When Garner spoke to Kimberly about the location, Kimberly stated that she worked at a hotel that was connected to the bar and she was just ordering food. Kimberly also told Garner that certain areas of the hotel were "'sketchy'" because drug deals occurred at the hotel. It was concerning to Garner that Kimberly would work at a hotel known to have drug activity given her inability to maintain her sobriety. It was also concerning that Kimberly would take Fahya to a place like that. When Garner advised Kimberly not to have visits there anymore, she complied. And after hearing Garner's concerns, Kimberly did get a different job in May.

Garner testified that the chemical dependency evaluation Kimberly completed in January 2017 recommended outpatient level 1 treatment. Garner was concerned after reviewing the evaluation because it stated that Kimberly reported to the therapist that her last usage of methamphetamines was 2 years ago, but NFC had multiple positive-confirmed lab results within those 2 years. Kimberly did complete the recommended treatment in June. Garner also reviewed all lab results of Kimberly's UAs. She was concerned because, starting in May, "her creatinine levels started to become lower and lower" and "that was concerning that she was diluting her tests." When asked if Kimberly had a "lab-confirmed dilute," Garner said she did in August. Garner testified that when she spoke to Kimberly about the low creatinine levels and concerns of dilution, Kimberly

> reported to me that she doesn't believe in these tests because she thinks that they're false and against her. She told me a time that she used Mountain Dew in one of her UAs and that it came back positive, so there was no way that that was positive. And she also told me that before [Fahya] was removed in 2016, she was buying fake urine and using that during . . . her test.

It was concerning to Garner that Kimberly would try to fake a UA because, "If she keeps saying that she's consistently sober, why do you need to try to fake a UA?" On cross-examination, Garner acknowledged that during her time on the case Kimberly had not testified positive in a UA.

On cross-examination, Garner acknowledged that at a team meeting in January 2017 (which she attended before officially becoming the caseworker), there was discussion of moving visitation to semisupervised. One of the conditions was that Kimberly had to maintain her sobriety though consistent UAs for a few months, which she did. When asked why semisupervised visits were never implemented, Garner said, "[b]ecause termination for parental rights was filed." On redirect, Garner said that a diluted UA in August 2017 and a positive hair follicle test in September "would lead us to believe that she's not maintaining her sobriety" and she would not recommend semisupervised visits at the time of the termination hearing.

Garner testified that it would be in Fahya's best interests to terminate Kimberly's parental rights. She said that Fahya is "only five years old and she has spent more than half her life in foster care." "Fahya deserves permanency, and she deserves a normal life." Garner did not think Kimberly could provide permanency because she had not been able to consistently prove her ability to remain sober.

Sarah Valentine, the supervisor of the drug testing department at Owens & Associates, testified that Kimberly initially became a client in September 2015. Valentine's report of Kimberly's drug tests with Owens & Associates, and copies of the drug test lab results were received into evidence without objection. According to Valentine, Kimberly's last presumptive positive drug test was in January 2017, there was an unsuccessful attempt in March, and on June 10 Kimberly could not produce enough of a sample for testing.

Valentine's report includes each date Kimberly was to submit to a UA. The report indicates whether a collection was successful or not (e.g., if she failed to test). If a collection was obtained, the report notes whether Kimberly tested negative for drugs or whether there was a "presumptive positive" for drugs; all presumptive positive tests were then sent to the lab for further screening. We summarize Valentine's report, including whether Kimberly had presumptive positive drug

tests; if there was a presumptive positive test on any given date, we will include the followup lab result for that collection date. Valentine's report shows that between September 2015 and September 2016, Kimberly completed 67 out of 106 UA drug tests. She tested presumptive positive for methamphetamines on the following dates in 2015: November 8 (lab result negative) and December 27 (lab result invalid due to low creatinine level). Kimberly tested presumptive positive for drugs on the following dates in 2016: January 5 (presumptive for methamphetamines, lab results state "Substituted" and notes creatinine level); February 24 (presumptive for methamphetamines and amphetamines, lab result confirmed positive); and May 19 (presumptive for opiates/morphine, no corresponding lab report for that date). There was also a positive lab test result for methamphetamines and amphetamines on February 20, even though Kimberly's field test was negative that day. She was discharged from testing services on September 8 and resumed services on November 28. From November 28 through October 4, 2017, Kimberly completed 100 out of 115 UA drug tests (other than on March 31 and June 10, she has completed all tests since January 10). Kimberly had presumptive positive tests for methamphetamines on January 2 (lab result negative), January 4 (also presumptive for benzodiazepines, lab result negative), and January 22 (lab result confirmed positive).

The drug testing lab reports show invalid tests due to low creatinine levels were collected on the following dates in 2015: September 30, October 28, November 17, 22, 23, and December 11, 27, and 30. Dilute, but negative collections were taken on October 14, November 3 and 15, and December 14. Invalid tests due to low creatinine levels were collected on February 4 and 8, and June 13, 2016. Dilute, but negative collections were taken on June 5, 2016, and on August 4, 2017.

Sarah Zinke, a drug screen technician for Owens & Associates, testified that she was the collector for Kimberly on December 18, 2016. During that test, a "medical hat," "a device used for hands-free urine collection," was used. The medical hat eliminates the need for a cup and "[f]or clients that are using medical hats, there's no hands between the legs" which "eliminate[s] any possibility of manual tampering." Zinke testified Kimberly put "one hand down between her legs and her crotch, even though she had been instructed it was a hands-free test." "[I]mmediately following, there was a small splash of water or of liquid that I could hear in the medical hat. And . . . when [Kimberly] pulled her hand out, she wiped her hands on her jeans, and I could actually see where the dampness from her fingers had been." Kimberly told Zinke that she was just adjusting her shirt and that was why her hands had been near her abdomen. Zinke told Kimberly her hands were nowhere near her shirt, that this was not a valid test, and there would be no more testing attempts that day because Zinke considered it a clear violation of testing protocol. Zinke's concern was that Kimberly was providing a urine specimen that was not her own.

Meladee Williams manages and does drug and alcohol testing collections for DrugTek in Omaha, Nebraska. Kimberly started coming to DrugTek in March 2016 for hair follicle testing. According to Williams, a head hair follicle can look back approximately 90 days, whereas a body hair follicle can look back approximately 12 months. Copies of Kimberly's hair follicle drug test results were received into evidence without objection. Williams testified that Kimberly had a positive head hair collection on March 1, 2016, and a positive body hair collection on November 23; both tests were positive for methamphetamines. The drug test results show that Kimberly had a negative head hair test in August, a positive body hair test in November (methamphetamines and

THC), and a negative body hair test in December. In July 2017, Kimberly's head hair tested negative. Kimberly's head hair tested positive for methamphetamines on September 15 (less than one month before the termination hearing); Kimberly was surprised by the result of the test she had paid for herself in anticipation of the termination hearing. She had a negative head hair test two weeks later on October 2. When asked if, to her knowledge, both September tests were complete and accurate, Williams said, "Yes." When asked if they would show different periods of use, Williams again said, "Yes."

*Juvenile Court's Decision.*

In an order filed on October 13, 2017, the juvenile court terminated Kimberly's parental rights to Fahya pursuant to § 43-292(2), (6), and (7), and found that termination was in the child's best interests. Kimberly has timely appealed the juvenile court's order.

ASSIGNMENTS OF ERROR

Kimberly assigns, restated, that the juvenile court erred in finding that (1) statutory grounds exist to terminate her parental rights under § 43-292(2) and (6), and (2) termination of her parental rights was in Fahya's best interests.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings. *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016).

ANALYSIS

*Statutory Grounds for Termination.*

In Nebraska statutes, the bases for termination of parental rights are codified in § 43-292. Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012).

In its order terminating Kimberly's parental rights to Fahya, the juvenile court found that statutory grounds existed pursuant to § 43-292(2) (substantial and continuous or repeated neglect), § 43-292(6) (having determined child was juvenile as described in § 43-247(3)(a), reasonable efforts to preserve and reunify the family had failed to correct conditions leading to determination), and § 43-292(7) (child in out-of-home placement 15 or more of past 22 months). Kimberly does not challenge the statutory grounds for termination under § 43-292(7), and based on our de novo review, we find clear and convincing evidence to support termination under that subsection.

Kimberly and the State stipulated at the termination hearing that Fahya had been out of the home for 15 or more of the most recent 22 months. Fahya has been in an out-of-home placement for all but 4 months since April 2014. At the time the motion to terminate parental rights was filed on March 31, 2017, she had been in an out-of-home placement for nearly 32 of the previous 36 months. At the time of the termination hearing in October, Fahya had been in an out-of-home placement for 38 of the previous 42 months. Our de novo review of the record clearly and

convincingly shows that grounds for termination of Kimberly's parental rights under § 43-292(7) was proven by sufficient evidence.

We need not consider Kimberly's challenge to the termination of her parental rights under § 43-292(2) or (6) since any one ground of the 11 identified in § 43-292 can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the children. See *In re Interest of Elizabeth S., supra*. Thus, the next inquiry is whether termination is in the child's best interests.

*Best Interests.*

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). But that is not all. A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014).

There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id*. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that a parent is unfit. *Id*. The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the children's best interests. *In re Interest of Nicole M., supra*. Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's wellbeing. *Id*. The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id*. And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id*.

In the instant case, Kimberly's sobriety has been an ongoing concern for years. Fahya was removed from Kimberly's care in April 2014 because of Kimberly's drug use and because drugs were being sold out of the home, including when Fahya was present. Kimberly subsequently completed court-ordered residential treatment and then completed outpatient treatment. Following treatment and several months of clean drug screens and liberalized visits, Fahya was returned to Kimberly's home in November 2015. However, Fahya had to be removed just 4 months later after Kimberly had positive drug tests. Following Fahya's removal in March 2016, Kimberly missed numerous drug tests, causing her to be discharged from services in September. After obtaining a new referral for drug testing services in November, Kimberly continued to miss numerous tests. Finally, in January 2017, Kimberly began to regularly complete her UA testing.

In her brief on appeal, Kimberly asks this court to focus on the progress she made in 2017; however, the record shows that there were continued concerns even in 2017. Kimberly had a lab-confirmed positive test for methamphetamine from her collection on January 22. She missed a test on March 31 and could not produce enough sample for testing on June 10. On August 4, she had a lab-confirmed diluted sample, although the lab report shows a negative test result for drugs. It was during a discussion with Garner in August 2017 concerning diluted samples that Kimberly reported that she does not believe in the drug tests because she thinks that they are false and against

- 8 -

her, a sentiment expressed by Kimberly in the past as evidenced in the court reports. She also acknowledged faking drug tests in the past, a concern to Garner given that some of Kimberly's samples continued to have low creatinine levels. Finally, Kimberly's head hair follicle tested positive for methamphetamines on September 15, less than 1 month before the termination hearing. As noted previously, head hair follicle tests can look back approximately 90 days.

The testimony at the termination hearing was that Kimberly had a job and was renting a house from a man incarcerated on drug charges. According to Valentine's report, in January 2017, Kimberly admitted to taking a prescription that was not in her name; the name on the prescription was the same as the man she was renting from at the time of the termination hearing. And as discussed earlier, Kimberly was previously working at a hotel that she herself described as "'sketchy'" because of drug activity there--the same hotel where she had taken Fahya for a visit. After discussions with Garner, Kimberly did get a new job and no longer had visits with Fahya at that hotel. But it is still concerning that she thought employment at that location, and having visits there was appropriate, given issues regarding her sobriety and the ongoing juvenile case.

Admittedly, there were no other safety concerns regarding Kimberly and Fahya's visits, and the testimony was that the visits were "generally very smooth." However, after having Fahya removed from her the second time in March 2016, Kimberly has not been able to move beyond supervised visits. We recognize that there were a number of months following Kimberly's positive drug test in January 2017 during which she was on a good path and making progress, yet semisupervised visits were not implemented. The testimony at the termination hearing indicates that the only reason visits did not progress to semisupervised at that time was because the motion to terminate parental rights had been filed. That motion was filed on March 31 because Kimberly had been unable to maintain her sobriety, causing Fahya to be placed out-of-home for a long period of time. The record indicates that Kimberly has been able to get sober in the past, but cannot maintain her sobriety in the long run. For instance, she completed residential treatment and outpatient treatment in 2014 and was eventually able to get Fahya placed back in her home in November 2015. But 4 months later, Kimberly was no longer sober and Fahya was removed from her care once again. She appeared to regain her sobriety after January 2017. But at the termination hearing, Garner testified that the diluted UA in August 2017 and a positive hair follicle test in September "would lead us to believe that she's not maintaining her sobriety." Because Kimberly could not maintain her sobriety, Garner said that semisupervised visits would not be recommended at that time. Both Pijewski and Garner testified that Fahya needs and deserves permanency in her life, but that Kimberly was unable to provide that because of her inability to remain sober.

This case comes down to Kimberly's inability to remain sober. She has had periods of sobriety, like in 2015 when she regained placement of Fahya and in the months following January 2017. However, she has not been able to maintain her sobriety as evidenced by positive drug tests in 2016, and most notably a positive test less than 1 month before the termination hearing. She has been unable or unwilling to maintain her sobriety despite the fact that this juvenile case has been ongoing for a number of years, and she knew that her relationship with Fahya was at stake. Garner testified that it would be in Fahya's best interests to terminate Kimberly's parental rights. As stated by Garner at the termination hearing, Fahya is "only five years old and she has spent more than half her life in foster care." Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Walter W.*, 274 Neb. 859, 744 N.W.2d

55 (2008). Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Ryder J., supra*. We find that the State has rebutted the presumption of parental fitness as to Kimberly. We further find that there is clear and convincing evidence that it is in Fahya's best interests to terminate Kimberly's parental rights.

## CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court terminating Kimberly's parental rights to Fahya.

AFFIRMED.